**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

IN THE MATTER OF THE SEARCH OF:          Case Number:  23-mj-08204-TJJ

A WHITE IPHONE WITH TWO CAMERA
LENSES AND A CRACKED BACK WITH
NO IDENTIFYING NUMBERS RECOVERED
FROM TARRIN LANG'S BACKPACK

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

1.  I, Joshua Temple, a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being first duly sworn, hereby depose and state as follows:

2.  I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), a component of the U.S. Department of Justice, having been so employed since March 11, 2020. I am currently assigned to ATF Kansas City Group I, and charged with investigating violations of Federal Firearms, Explosives, and Arson Laws. I have successfully completed the Criminal Investigator Training Program and the ATF Special Agent Basic Training at the Federal Law Enforcement Training Center in Glynco, Georgia. Prior to that, I was employed as a Police Officer with the Baltimore City, Maryland Police Department for approximately two years and an armed federal contractor for the Department of Homeland Security and Federal Protective Services for approximately one and a half years. I have been a member of the Army Reserves for 17 years, where I am a Military Intelligence Officer and former Military Police Officer.

3.  During my tenure as a Special Agent, I have received numerous hours of specialized training in the investigation and prosecution of firearm and drug-related crimes. I have participated in numerous investigations involving the possession of firearms and illegal acquisition of firearms by both prohibited and non-prohibited persons. I have also participated in undercover

1

operations involving firearms trafficking, the illegal distribution of controlled substances and the distribution of monies by individuals and criminal organizations derived from the illegal activity. During the course of my employment, I have participated in numerous investigations which led to the prosecution of suspects. My training and experience has involved, among other things, (a) the debriefing of defendants, witnesses, informants, as well as others who have knowledge of the distribution and transportation of controlled substances and / or the illegal acquisition and distribution of firearms, and the laundering and concealment of proceeds of firearms trafficking/ drug trafficking; (b) surveillance; and the analysis of documentary and physical evidence. Based on my training and experience as an investigator, I have become familiar with the manner in which firearms traffickers and narcotics traffickers conduct their firearms and narcotics related business, including the methods employed by narcotics dealers to import and distribute narcotics, the manner in which firearms are exported and / or transported illegally, the methods in which individuals collect and launder firearm and narcotic proceeds, and other aspects of firearms and narcotics trafficking. These methods include but are not limited to the use of wireless communication technology (such as cellular phones), the utilization of computers, social media, electronic mail, counter-surveillance, false or fictitious identities, and the use of coded communications in an attempt to avoid detection by law enforcement. I have been personally involved in numerous investigations involving the unlawful possession of firearms and machine guns and the possession, manufacture, and distribution of controlled substances, including cocaine, methamphetamine, fentanyl, heroin, and marijuana.

4. This Affidavit contains information necessary to support probable cause for the Application. It is not intended to include every fact or matter observed by me or known by law enforcement.

The information provided is based on my personal knowledge and observations during the course of this investigation, information conveyed to me by other law enforcement officials, and my review of records, documents, and other physical evidence obtained during this investigation. I make this affidavit based on personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

A.   my experience investigating firearms offenses, drug trafficking and distribution and organized criminal groups;

B.   discussions I have had personally concerning this investigation with investigators experienced in firearms, drug trafficking, money laundering and organized criminal groups; and

C.   public records.

5. This Affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF CELLULAR TELEPHONE TO BE EXAMINED

6. The property to be searched is a cellular telephone (referred to as the "**Target Telephone**"). The property to be searched is a white Apple I-Phone with two camera lenses and a cracked back with no identifying numbers belonging to Tarrin LANG recovered from his backpack during the execution of an arrest warrant. The **Target Telephone** is currently in the possession of the Overland Park Police Department in Overland Park, Kansas.

7. The applied-for warrant would authorize the forensic examination of the **Target Telephone** for the purpose of identifying electronically stored data particularly described in Attachment A.



<u>FACTS SUPPORTING PROBABLE CAUSE</u>

8. The items to be seized constitute evidence and instrumentalities, in whatever form and however stored, relating to violations of federal law, including, but not limited to: distribution of controlled substances in violation of Title 21, United States Code, Section 841(a)(1); use of a communication facility to facilitate a controlled substance offense, in violation of  Title 21, United States Code, Section 843(b); knowing possession of a machinegun,  in violation of Title 18, United States Code, Section 922(o); and possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18 United States Code, Section924(c)(1)(A)(i).   (Hereafter, the "Target Offenses".)

9. Based on the below facts, I have probable cause to believe a search of the **Target Telephone** will lead to evidence of the Target Offenses, as well as the identification of individuals who are engaged in the commission of these offenses.

10. On June 27, 2023, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Joshua Temple opened a case in reference to the recovery of three machineguns, drugs and U.S. Currency recovered by Overland Park Police Department during an arrest operation resulting in the arrest of three Solid Ass Family (SAF) gang members. SA Temple learned of the incident from Overland Park Detective and ATF Special Deputy (SD) Geoffrey Gahn.

11. SD Gahn provided SA Temple with the police report associated to the initial arrest and recovery of the evidence. SA Temple reviewed the initial report. SA Temple learned that on April 17, 2023, members of the of the Kansas City FBI Career Criminal Task Force were conducting an arrest operation of known felon, Tarrin LANG at 5010 Indian Creek Parkway, Overland Park, Kansas. LANG was wanted on a felony warrant out of Jackson County, Missouri (Case Number 2016-CR01406) for aggravated assault against law enforcement officers and was reportedly known to be armed and consistently run from police.

12. Officers observed LANG exit the apartment with two other males. As law enforcement moved in to apprehend LANG, he fled on foot while the other two males surrendered in the parking lot.

13. LANG fled on foot east through a wooded area and was ultimately arrested outside a business a short time later. While fleeing, officers observed LANG toss a pink Adidas backpack with a multicolored design which was secured by law enforcement.

14. After LANG was handcuffed, he was walked to the front hood of an unmarked police vehicle. As he was walking over, LANG began coughing a few times.  The officer then started to search LANG incident to arrest and laid him forward onto the hood of the car.  The hood was clear of spit or other foreign material at the time.  As the officer searched LANG, they took note of spit coming from LANG's mouth.  As LANG was stood up, the officer could see the spit now lying on the hood from LANG.  A DNA sample of the saliva on the vehicle was then taken.

15. Officers searched the pink Adidas backpack with a multicolored design belonging to LANG. Located inside the backpack were two prescription pill bottles with LANG's name on them, a total of five bags of marijuana with a total weight of 1,223.3 grams (including packaging) and a digital scale.  Located on LANG's person was $2,415.00, a pink "M10" pill suspected of being fentanyl, and a cellphone, hereafter identified as the **Target Telephone**.

16. The marijuana was later tested using a NARK 2 test kit which showed a presumptive positive for marijuana.  The marijuana was later submitted to the Johnson County Controlled Substance Lab and was confirmed to be marijuana.

17. Based on my training and experience, the large amount of marijuana packaged into smaller bags, the digital scale, and the large amount of currency is indicative of illegal drug distribution.

18. A drug detection canine was used to do a sweep of LANG's 2018 Jeep Grand Cherokee parked in the parking lot and this resulted in a positive hit.  The vehicle was then towed pending a search warrant.

19. On April 19, 2023, a search of the Jeep Grand Cherokee was conducted pursuant to a search warrant issued on April 18, 2023, by the Johnson County District Court. Recovered from

inside the vehicle was an opened box of Good Sense fold top plastic baggies, a tan Glock 9mm magazine containing 17 rounds of Jag Luger hollow point 9mm ammunition, and a 9mm round of ammunition with FC 9mm Luger stamped on the head.

20. After the search of the vehicle was complete, detectives returned to the area where LANG ran from police to conduct a secondary search of the area. Located in the area LANG fled, detectives recovered a black Heron Preston hooded sweatshirt with white lettering on each sleeve, the front chest area and back of the garment. Detective Reeder later confirmed through body camera footage that LANG wore that garment along with the backpack that contained the 1,223.3 grams of marijuana at the time officers attempted to arrest him outside the apartment building on April 17, 2023.

21. ATF SA Tyree Koerne and his explosive detection canine (Shiloh) were requested to respond to the location to assist in the secondary search for any firearms that may have been discarded by LANG.

22. SA Koerne and Shiloh located a tan Glock, model 19X, 9mm pistol, serial number BGYT528 on the east bank along the creek in the wooded area LANG fled from law enforcement. The firearm was missing a magazine but had one 9mm Jag Luger hollow point round of ammunition in the chamber.

23. SA Koerne continued to have Shiloh search the immediate area. A few moments later Shiloh alerted on an extended magazine located up on the west bank of the creek close in line with the location of the firearm. The magazine was OD Green and contained twenty-seven (27) 9mm Jag Luger hollow point rounds of ammunition.

It should be noted the ammunition located in the chamber of the Glock and the extended magazine appeared to be the same brand of ammunition as the ammunition located in the Tan Glock magazine from LANG's Jeep Grand Cherokee.

24. An NCIC check of the firearm's serial number was conducted and returned stolen on November 24, 2022. The victim in the case was a Kansas City, Missouri police sergeant.

25. The Glock firearm was later examined by SD Gahn who noticed a machinegun conversion device, commonly referred as an "auto sear," was located inside the firearm. A machinegun conversion device allows a firearm to function as a fully automatic weapon, referred to in federal statutes as a "machinegun." These devices may not be transferred or possessed under 18 U.S.C. 922(o), with limited exceptions.

26. Based on my training and experience, I know that it is common for people to fire guns they recently purchased and commonly take photos and/or videos on their cell phones of them shooting the firearm. These photos and/or videos would show his knowledge that the firearm had been converted to a machinegun.

27. The Glock firearm and extended magazine were swabbed for DNA. Those swabs along with the swabs taken from the unmarked police vehicle of LANG's saliva were sent to the Johnson County Crime Lab for comparison. Johnson County Crime Lab compared the samples and concluded that LANG's DNA was located on the firearm with a likelihood of the DNA belonging to someone else as 1 in 8.86 million.

28. It should be noted that the Glock firearm and extended magazine were also submitted for latent print examinations by Overland Park Police Department. No latent prints sufficient for further analysis were discovered.

8

29. The Glock firearm listed above was also submitted to the Johnson County Firearms Lab for a determination on the machinegun conversion device. The lab determined the firearm had been modified, rendering it capable of firing fully automatic.

30. Based on my training and experience I know the following:

    a. Persons involved in the possession and distribution of controlled substances utilize cellular telephones to conduct their illicit transactions. This would include contacting customers, sources of supply and those assisting in the distribution of controlled substances.

    b. Persons involved in the possession and distribution of controlled substances commonly maintain telephone contact lists or directories. These often include names, nicknames, email addresses and contact numbers of those involved in illicit activity.

    c. Those involved in the possession and distribution of controlled substances conduct their illicit trade via internet and cellular phone in various forms to include but not limited to conversations, voice messages, text messages, instant messaging, various messaging applications and social media. It is also common for narcotics traffickers to carry multiple cellular phones and switch the phone frequently.

    d. Persons involved in the possession and distribution of controlled substances often take photographs of themselves with associates at all levels of the organization, as well as photographs of them with narcotics and weapons.

    e. Those involved in the possession and distribution of controlled substances use and possess firearms to protect themselves, the illegal proceeds, and controlled substances from others.

f.  Persons involved in the possession and distribution of machinegun conversion devices who are prohibited from possessing firearms utilize cellular telephones to contact persons for the purpose of obtaining and purchasing firearms they cannot legally purchase from a Federal Firearms Licensee.

g.  Persons involved in the possession and distribution of machinegun conversion devices utilize cellular telephones to conduct their illicit transactions.  This would include contacting customers, sources of supply and those assisting in the distribution of the devices.

h.  Persons involved in the possession and distribution of machinegun conversion devices commonly maintain telephone contact lists or directories.  These often include names, nicknames, email addresses and contact numbers of those involved in illicit activity.

i.  Those involved in the possession and distribution of machinegun conversion devices conduct their illicit trade via internet and cellular phone in various forms to include but not limited to conversations, voice messages, text messages, instant messaging, various messaging applications and social media.

j.  Persons involved in the possession and distribution of machinegun conversion devices often take photographs and/or videos of the devices both installed in firearms and out of firearms.  They also make videos of the installation and manufacturing of the machinegun conversion devices.

k.  Those involved in the possession and distribution of machinegun conversion devices use and possess firearms to protect themselves, the illegal proceeds, and the machinegun conversion devices from others.

31. Based on my training and experience, I believe cellular phones, especially iPhones, must be powered on and charged for their contents to be downloaded. Once a cellular phone loses power and shuts off, the information from the phone can be lost and not recovered unless law enforcement was able to obtain a passcode, or the phone was not locked. Quick recovery of the contents of a cellular phone that is linked to criminal activity is essential and vital to criminal investigations to prevent the destruction of evidence upon powering down the phone.

32. Based upon the aforementioned facts, I believe the seized **Target Telephone** contains data and information that will constitute evidence of violations of federal law, including, but not limited to the Target Offenses.

33. I know that retrieving names, and the respective phone numbers associated with them, would assist in further identifying relationships and identities of subjects associated with this investigation. Based upon my training and experience, examining data stored on cellular telephones can uncover, among other things, evidence that reveals or suggests who possessed or used the device, how the device was used, the purpose of its use, and when it was used.

## REQUESTED AUTHORIZATION

34. At the time of the presentation of this Application and Affidavit, the **Target Telephone** is located and secure at the Overland Park, Kansas Police Station. Pursuant to Federal Rule of Criminal Procedure 41(b)(2), the **Target Telephone** may be moved outside the District of Kansas for the purpose of executing the search warrant. I hereby request the Court's permission to conduct a full and complete forensic examination of the **Target Telephone**. This exam includes a search of contact lists, calendars, stored image and video files, internet history, location data, SMS and MMS text messaging, and other data related to the

investigation (see Attachment A).

35. Based on my training, experience, and discussions with a certified Cellebrite cellphone examiner, I know the capabilities and limitations of the Cellebrite Universal Forensic Extraction Device (UFED). I know UFED is a forensically sound extraction tool that is used by forensic examiners to gain access into cellular devices to conduct a forensic investigation. Although highly effective, UFED occasionally encounters cellular devices that cannot be accessed. In cases when UFED cannot access a cellular device, other forensic tools can be used such as GrayKey, which can be effective in accessing the target device. With the ever-changing world of technology and with how rapidly new cellphones are produced by a number of cellular telephone manufacturers not all cellular telephones are able to be fully downloaded by the Cellebrite UFED device. I know that, based on compatibility, some cellular telephones are able to be downloaded but the data that is extracted may not be complete. Additionally, with the countless number of available applications available for cellular telephones, newer applications installed on the phone may not be recognized by Cellebrite, therefore the data will not be extracted.

TECHNICAL TERMS

36. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile phone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the

12

telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books" or "contacts" lists; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. GPS: A GPS navigation device uses Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of multiple satellites orbiting the earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

c. IP Address:  An Internet Protocol address (or simple "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four

numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

d.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

e.  Geotagging: Geotagging is a feature that geographically tags the location and time of a photograph taken. The data saved at the time the image is captured is usually placed in a JPEG file using the exchangeable image file format (EXIF). The metadata within the EXIF is then readable by numerous photo editing software programs. Simply defined, metadata contains data that describe a file. In the case of EXIF metadata, it is data that describes data used by digital cameras, digital imaging software, and others to describe the particular attributes of a digital image file. The tagging information is added to photographs or video at the time it is taken if the geotagging tool is enabled in the camera settings. Programs such as Google Maps can be used to track the location a photograph or video was taken using the metadata encoded in photograph or video.

37. Based on my training, experience, and research, I know the **Target Telephone** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media

14

player, GPS navigation device, a computer, and PDA. In my experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

<u>ELECTRONIC STORAGE AND FORENSIC ANALYSIS</u>

38. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

39. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the filed does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

40. There is probable cause to believe that things that were once stored on the **Target Telephone** may still be stored there, for at least the following reasons:

   a. Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   b. Wholly apart from user-generated files, computer storage media—in particular,

15

computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    c. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

41. *Forensic evidence.* As further described in Attachment A , this Affidavit and accompanying Application  seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Telephone** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Target Telephone** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment

16

of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and sequence in which they were created.

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

42. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Target Telephone** consistent with the warrant. The examination may require authorities to employ techniques, including

but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

43. *Manner of execution*. Because this Application and Affidavit seeks only permission to examine a device already in law enforcement's possession, the execution of the warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

44. Based on the foregoing, my training and experience, and the evidence gathered in the course of the investigation, I believe there is probable cause for a search warrant authorizing the examination of the **Target Telephone** described in this Affidavit and accompanying Application,  to seize the items described in Attachment A, which is property that constitutes evidence and instrumentalities, in whatever form and however stored, relating to violations of the Target Offenses.

I declare under penalty of perjury that the foregoing is true and correct.

JOSHUA TEMPLE
c=US, o=U.S. Government, ou=Dept of
Justice, ou=ATF, cn=JOSHUA TEMPLE,
0.9.2342.19200300.100.1.1=15001003930086
2023.10.03 12:55:09 -05'00'

Joshua Temple
SA Bureau of Alcohol, Tobacco, Firearms & Explosives

Sworn and attested by affiant via telephone, after being submitted to me by reliable electronic means on this 4th day of October 2023.

HONORABLE Teresa J James
United States Magistrate Judge

18

**ATTACHMENT A**

All records, data and information on the listed cellular telephone **(Target Telephone)** described in the Application and Affidavit related to violations of federal law, including, but not limited to: distribution of controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1); use of a communication facility to facilitate a controlled substance offense, in violation of Title 21, United States Code, Section 843(b); knowing possession of a machinegun, in violation of Title 18, United States Code, Section 922(o); possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i).  Probable cause exists to believe the information and items listed below will be found secreted in the **Target Telephone**.

a.      Contact information, incoming and outgoing call information, pictures, videos, stored voicemail and text messages.

b.      Any information related to selling or purchasing firearms (including names, addresses, phone numbers, or any other identifying information).

c.      Device ownership and user information, including evidence of user attribution showing who used or owned the **Target Telephone** at the time the things described in the warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

d.      Photographs, images, and videos of firearm trafficking activity, associates, instrumentalities or proceeds of firearms sales; including stored information related to the date, time, user and owner of the device, and location of the image generation.

e.      Any geotagging information such as the camera's date and time clock, make and model, serial number, and location of photographs and videos determined by the camera's Global Positioning System receiver or geotagging tool. Including any identification information related to the use and ownership of the devices.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.